Thomas B. MURNANE, Jr., Appellant,

v.

Katherine T. MURNANE, Appellee.

Court of Appeals of Kentucky.

Nov. 28, 1969.

John K. Stiles, William S. Bowman, Stiles & Miller, Louisville, for appellant.

John L. Harbolt, Louisville, for appellee.

DAVIS, Commissioner.

On June 13, 1964, Thomas B. Murnane, Sr., died testate indebted to First National Lincoln Bank. He had assigned certain life insurance policies to the bank as collateral and had pledged other securities for that purpose as well. The basic controversy presented on this appeal is whether the payment of the indebtedness should have been made from the proceeds of the insurance policies or from the proceeds of sale of the other collateral. The chancellor found that the securities had value of $48,066.71 and adjudged that the appellee, as surviving widow of the decedent, should recover fifty percent of that sum and entered judgment in her behalf for $24,033.35. The appellant contends that the court should have awarded nothing to the appellee.

The appellee sued Thomas B. Murnane, Jr., individually and as executor of Thom-

as B. Murnane, Sr., asserting that her deceased husband, Thomas B. Murnane, Sr., had conspired with her stepson, the appellant, to defeat her distributable estate. This allegation was the basis of an attack on a buy-sell agreement which had been entered into between Murnane, Sr., and Murnane, Jr., concerning a business holding in which each was interested. By amended complaint, appellee asserted that Murnane, Sr., lacked mental capacity to enter into the agreement and that he was under the influence of alcohol at the time of its execution. By another amendment to her complaint, appellee charged that appellant, as executor of the will of Murnane, Sr., had improperly authorized a payment of the debt to the bank from general assets of the estate when he should have first applied the proceeds of life insurance policies to that end.

█ The chancellor specifically found that there was no proof to support the allegation of conspiracy to thwart appellee's dower rights. There was no specific finding concerning the claimed lack of mental capacity, but the appellee does not argue that such a charge was sustained, and we deem that basis for recovery as abandoned by the appellee.

The gist of the chancellor's reasoning in reaching his decision may best be gathered from the following excerpt taken from the trial court's opinion:

"While we recognize the right of the Executor in the absence of specific testamentary instructions to use what assets he chooses in satisfying the indebtedness against the estate we also are of the opinion that when an Executor will personally benefit to a great extent by employing one method of debt liquidation over another method and that to the detriment of other legatees so far as the sale of assets are concerned we believe that equity will demand a closer look and a higher degree of ethical consideration than would be the case were the Executor not personally interested in the distribution of the net estate. Price [Price's Adm'r] vs Price [291 Ky. 211], 163 S W 2nd 463."

\*    \*    \*    \*    \*    \*

"It appears from the records in the case that the personalty in the estate amounted to $48,066.71 in the form of securities and the widow under the Will would have received fifty percent of this amount which would be $24,033.35.

"We believe that the Plaintiff is entitled to a judgment against the Defendant personally and as Executor of the estate in the amount of $24,033.35, and her costs."

The indebtedness of Murnane, Sr., to the bank was evidenced by six notes in varying amounts which he had executed to the bank between July 6, 1961, and April 16, 1964. The decedent assigned various life insurance policies to the bank as collateral for the notes and also hypothecated a substantial quantity of stock in various corporations as collateral for the debts. The appellee was the named beneficiary in only one of the policies from which she collected $10,270. The decedent's first wife was the beneficiary of another policy having face value of $10,000, and the appellant, Murnane, Jr., was designated as beneficiary of the other policies and collected $40,000 as the proceeds from them.

Shortly after the death of Murnane, Sr., there was a discussion between the attorneys representing the appellant and appellee as to what proceeds should be used to discharge the notes at the bank. At that time the attorney for the appellee suggested that the debt should be paid out of assets other than insurance. Later the same attorney confirmed that suggestion and called attention to this court's decision in Schum v. Lawrenceburg National Bank, 314 Ky. 297, 234 S.W.2d 962, as authority supporting his position. Accordingly, the bank did cause the stocks to be sold and applied the proceeds to the liquidation of decedent's debt. It also arranged for the collection of the life insurance policies and

distributed the proceeds to the respective beneficiaries. Murnane, Jr., complied with the buy-sell agreement between his father and himself and paid into the estate the money due on that account. When the estate was so supplemented, it had assets sufficient to completely discharge the indebtedness to the bank, although we are told in the briefs that the estate is substantially insolvent.

In Schum v. Lawrenceburg National Bank, 314 Ky. 297, 234 S.W.2d 962, this court dealt with the general problem which arises when life insurance policies are assigned as collateral for debt. The court pointed out that the intent of the insured decedent governs the matter as to whether the debt shall be paid from proceeds of insurance or from other assets of the estate. In Schum the court considered and distinguished Kash's Ex'r v. Kash, 260 Ky. 508, 86 S.W.2d 273; Berger v. Berger, 264 Ky. 225, 94 S.W.2d 618; and Froman v. Froman's Ex'r, 293 Ky. 1, 168 S.W.2d 361, and said of them:

"In each of these cases it was held that the indebtedness should be paid from the proceeds of the assigned insurance policy rather than from the estate, since from the facts it appeared that such was the intent of the insured. In the Froman case the assignment provided that no person interested in the policy should, by reason of the application of the proceeds of the policy to the indebtedness secured by the assignment, have the right to contribution or reimbursement from any other party or be subrogated to the right of the assignee in any other collateral. No such provision is found in the assignment here involved. In the Kash and Berger cases the mortgage contained a clause providing 'if said policy of insurance be still in force, the indebtedness secured hereby shall become immediately due and payable upon the death of the insured, and the [creditor] shall apply toward the payment thereof the amount due from it under the terms of said policy and pay over the balance,

if any, to such person or persons as may be legally entitled thereto.' * * * In each of these cases the court said that the language of the mortgage was broad enough to convey the intention of the insured and to establish his and the creditor's agreement that in the event of his death the creditor was to utilize the proceeds of the policy for the payment of decedent's debt before resorting to the enforcement of the mortgage. Neither of the mortgages here involved contains any mention of the insurance policies. All of the above cases cite the case of Barbin v. Moore, 85 N.H. 362, 159 A. 409, 414, 83 A.L.R. 62, as setting forth the rule that the intent of the insured decedent governs, but each case was distinguished from the Barbin case on the facts. In Barbin v. Moore it was said that the failure of the insured to make his estate or the creditor the beneficiary of the policies when they were assigned, or to direct that the debt due the bank be paid from the proceeds of the policies, indicated his intent that the insurance money should be resorted to only after the other security had been applied on the indebtedness." Id. 234 S.W.2d 964.

The general rule, as expressed in Schum, is supported with virtual unanimity in jurisdictions which have considered the question. See 91 A.L.R.2d 496–507.

█ The assignments of the insurance policies in the case at bar contained no provision similar to the provision in the Froman case. Neither is there any showing of any provision similar to that appearing in the Kash and Berger cases specifically directing the creditor to apply the insurance proceeds to liquidation of the debt. The failures of the insured to designate his own estate or the bank as beneficiary under the policies, or to direct that the debt be paid from the proceeds of the insurance, serve to indicate that the decedent's intention was that the insurance money should be applied to the debt only after the other

securities had been exhausted—just as those failures did in Barbin v. Moore.

The chancellor did not purport to find as fact that the decedent's intent reflected his desire that the insurance proceeds be applied to the debt. The following excerpt from the chancellor's opinion illustrates this:

> "Since there is nothing in the record relative to directions or instructions to the bank or to his Executor in the event of his death relating to the liquidation of decedent's property in the satisfaction of his debts it could easily be assumed that he wanted the insurance policies pledged as collateral to satisfy these debts or that he wanted the personal property in the form of securities sold to satisfy these debts. However, since the insurance policies were of sufficient value to satisfy the bank indebtedness alone and also the pledged stock was of sufficient value to satisfy the indebtedness it would be safer to assume that the Decedent wished that or intended that the life insurance and the personal property both stand their proportionate share of the indebtedness.

> "Of course, this is all conjecture."

It was the chancellor's view that Murnane, Jr., acting as executor, when confronted with the option of selecting one of two methods of liquidating the debt to the bank was equitably and morally bound not to select the course most favorable to himself. Unquestionably, an executor occupies a fiduciary position and may not properly function as such when his personal interests are antagonistic to the interests of the estate. Price's Adm'r v. Price, 291 Ky. 211, 163 S.W.2d 463. But the situation at bar is not one in which the rights of the executor were antagonistic to those of the estate. As we have said, the general rule is that the proceeds of life insurance policies assigned as collateral for debt become only secondarily liable for the debt, absent a showing of the decedent's intention of a different result. If a stranger to the estate and to the insurance had served as execu-

tor, it seems plain that the principles expressed in Schum v. Lawrenceburg National Bank would have required his resorting to the general assets of the estate before encroaching upon the insurance proceeds. This is so because the precedents of this and other courts have announced the law so to be. We are unaware of any principle of law or equity which would require an executor to forfeit or forego the operation of a settled rule of law simply because following the rule will redound to his benefit.

Since there was no showing that the decedent intended that the proceeds of the life insurance policies should constitute the primary source of payment of his debt to the bank, the executor proceeded properly in causing the other assets of the estate to be applied to the debt. It was improper to impose liability upon him for complying with the established principle of law applicable in cases of this type.

The judgment is reversed with directions to enter a new judgment dismissing the complaint as amended.

All concur.